## GENERAL ELECTRIC CO. v. MINNEAPOLIS–HONEYWELL REGULATOR CO.

### No. 161.

Circuit Court of Appeals, Second Circuit.
March 17, 1941.

Harrison F. Lyman and William R. Woodward, both of Boston, Mass., and Alexander C. Neave, of New York City, for plaintiff.

Drury W. Cooper, of New York City, W. P. Bair and Will Freeman, both of Chicago, Ill., and George H. Fisher, of Minneapolis, Minn., for defendant-appellant.

Before SWAN, CHASE, and CLARK, Circuit Judges.

CHASE, Circuit Judge.

The plaintiff is the owner of United States Patent No. 1,583,496 which was granted May 4, 1926, on the application of William L. Shafer filed Feb. 23, 1924. The suit is the usual one in equity alleging that two thermostats made and sold by the defendant infringe claims 1, 2, 3, 5, 8, 9, 10 and 14–20, inclusive. Nothing turns upon the particular language of any claim and it is sufficient to state that they cover a heat-regulating system designed to control the rate of combustion in a furnace used to

heat houses whether the fuel be solid, liquid or a gas and are primarily directed to the thermostat used in the system. For present purposes other parts of the heating system may be ignored. All the claims were held valid and infringed in the decree from which the defendant has appealed.

The problem Shafer solved was created by two conditions inherent in such a heating system regulated by a thermostat. When a furnace is operated for a time under forced draft or its equivalent it will continue to supply a comparatively large amount of heat after the temperature at which the thermostat has been set has been attained. This continuation of heat will cause that temperature to continue to go up and overheat the room or house. This is called in the record "overshooting". Perhaps a seemingly obvious way to correct overshooting would be to set the thermostat so as to leave only a short range of variation between the upper and lower temperatures but that is not feasible because the contact points of the thermostat must always be placed far enough apart so that the current at one will not affect the other to prevent the firm setting that will do away with what is called "hovering" that causes sparks.

The thermostat of the patent uses the well-known principle that a bimetallic strip made of metals having different coefficients of expansion will warp when heated. Shafer perceived that that warping, which opened and closed the electrical circuit controlled by the thermostat, when brought about only by the temperature in the space to be heated took place too slowly to open the circuit and cut down the rate of combustion in the furnace before too much actual or potential heat could cause overshooting. His remedy for that, and it was a good one, was to increase the warping speed of the strip and thus get the effect of a closer setting of the contacts in the thermostat without, however, setting them closely enough to cause hovering. His way to make the bimetallic strip in the thermostat warp faster was to heat it faster by adding heat at a point near enough to it so that its action was affected both by the temperature of the space to be heated by the furnace and by the additional heat. And the method for so doing disclosed in his specifications was to install a small electric light near the bimetallic strip and connect it in the thermostat's circuit so that when the contacts closed to bring about an increased combustion rate in the furnace

the electric light would go on and burn until the strip so influenced by its heat would warp to shut off the forced draft before the temperature in the space to be heated had actually been raised to the degree at which the thermostat had been set. The furnace, of course, would continue to supply heat until it cooled but as part or all of such heat would be needed to bring the room temperature up to the actual thermostatic setting there would be less overshooting and conceivably none. Shafer disclosed as an alternative source of added heat a resistance coil instead of an electric light and that is clearly an equivalent means.

After Shafer had made and installed such a device in his own home, he made another for a friend who used that in his home. Such use antedated Shafer's application for his patent by more than two years and a part of the defense is that these uses were public and make the patent invalid under Sec. 31 of Title 35 U.S.C.A. Such uses did make it incumbent upon the plaintiff to prove that they were experimental only for otherwise they would be within what the statute makes unpatentable. A. Schrader's Sons v. Wein Corp., Inc., 2 Cir., 9 F.2d 306. But whether the uses were public or experimental was a question of fact. There was adequate evidence to show that Shafer was actually experimenting with and changing his device up to a time within two years of the date when his application for a patent was filed. Consequently the trial court was justified in finding, as it did, that there was no public use by Shafer or others more than two years prior to his application. The experimental use would not invalidate the patent. Elizabeth v. American Nich. Pavement Co., 97 U.S. 126, 24 L.Ed. 1000.

Several patents were introduced to prove that the claims were invalid for anticipation. Of these No. 1,403,963 granted to Klingel Jan. 17, 1922 on his application filed Jan. 22, 1920 shows a clear appreciation of the problem and a solution in the form not of added heat to influence the action of the bimetallic strip but of the use of a moveable U arm on the moving end of the strip. When contact was made, as for instance, to increase the combustion rate in the furnace, the continued effort of the strip to warp as the room continued to cool before the furnace supplied increased heat to warp the strip the other way would cause the U arm to turn out of line with

the strip itself and in the reverse movement it would accordingly reach the contact sooner to close down the furnace quicker. In this mechanical way, the traveling distance of the strip between the contact points was shortened without decreasing the actual distance. But the warping of the strip as room temperature rose was only what the furnace-supplied heat would give it and the warping rate was unchanged. Klingel's construction would be effective only when thermostatic pressure after contact at either the high or low setting had moved the U arm and then to the extent of such movement only. Shafer eliminated such a variable by using heat instead of hinges; by substituting a method that would work if it were successful in preventing overshooting entirely while Klingel needed the effect of overshooting, or its opposite, undershooting, to cause his U arm to move on the strip. The means employed to level out the temperature were much too diverse for Klingel to anticipate Shafer.

Hall's patent No. 1,501,017, granted July 8, 1924, on his application filed Nov. 29, 1919, is nearer to Shafer in that Hall used added heat to warp the bimetallic strip of his thermostat. But he was concerned with a different problem and it might be expected that he would solve it, as he did, in a different way. He wanted to prevent destructive overheating in an overloaded electric generator whether the overload was of long or short duration. It was known that under such an overload what was called a "hot spot" would develop somewhere and almost anywhere in the machine. He was confronted with the effect of mass upon heat diffusion, not of material concern to Shafer who had only the problem of overshooting due to the creation of added heat in a furnace after his control shut it down or the radiation of heat already there. Hall had no trouble from that since stopping the generator would stop the creation of heat and any radiation afterwards was desirable as that would cool the machine. As Hall couldn't know where the hot spot would develop and place his thermostat there, he got a like result by bringing an equivalent of the hot spot to the thermostat before any harmful heating occurred. To do that he put a resistance coil in the thermostat which carried current from the generator and would be overloaded when the generator was overloaded. That would supply the heat to actuate the thermostat to cause the generator to stop before it became too hot. Obviously, what Hall did had little in common with Shafer.

Nor does any other patent in the record come closer to Shafer except No. 1,321,287 granted to Daly & Dalton Nov. 11, 1919, on their application filed April 30, 1919. That was, indeed, considered in connection with Shafer's application in the Patent Office, and there held not to anticipate and yet it seems clearly to disclose all that Shafer claimed to have first invented. The only difference is possibly one of degree in that Shafer dealt with house heating while Daly & Dalton with incubator heating but if the incubator were large enough and the house small enough that difference would disappear with the use of identical heating units though, after all, that is but a theoretical concept of little importance provided the methods employed and the results attained are the same.

Daly & Dalton disclosed a much more complicated system of thermostatic control than did Shafer as they had a thermostat with three bimetallic strips one of which responded to the temperature outside of the incubator; one to the general inside temperature; and one to the inside temperature supplemented by heat from a resistance coil wound around it. We may disregard the outside element and consider only the part inside the incubator corresponding to Shafer's thermostat which was wholly inside the space to be heated and not directly responsive to anything outside.

The heat in Daly & Dalton came from a continuously operated electric heater placed inside the incubator and it was fed more current automatically to produce added heat whenever that was needed. Two bimetallic strips, each carrying a contact point, were arranged one above the other with the metal having the higher coefficient of expansion on the under side of the upper strip to make it move upwardly under the influence of heat and away from the lower coacting strip which had the metal with the higher coefficient of expansion on its upper side to make it move down with a rise in temperature. Thus cooling of the incubator brought the contacts on the strips together to close a circuit about to be explained and heating the incubator caused the strips to move apart and break that circuit. The upper strip was surrounded by a resistance coil in which current flowed when the thermostat's circuit was closed and supplied added heat to make the strip warp upwardly

quicker than it otherwise would. The lower strip carried insulation to prevent its being appreciably affected by heat from the upper strip's resistance coil and leave it responsive, as a practical matter, only to the general inside incubator temperature.

The circuit just mentioned is the one through which current was fed to the heater. It was in a line in which two resistance coils controlled the amount of heater current. When the strip-carried contacts of the thermostat were separated these resistance coils were connected in series and the current fed to the heater was cut down to decrease the heat supplied by it but when the incubator cooled and the thermostatic contacts were thus closed the resistance coils were in a shunt circuit and the current to the heater was increased with a consequent increase in the heat output. When this happened, current also was fed to the resistance coil surrounding the upper strip and heated that to make it move up more quickly and break the contact with the lower strip. Then the resistance coils in the line to the heater at once became connected in series and the heat supply was cut back to the lower rate. This action was repeated to keep the incubator at whatever temperature was desired. The method included the addition of heat directly to a thermostatic strip during the period the heater was being operated at what may be called its high rate to make the strip respond more quickly to the rise in incubator temperature than it would if left to be actuated by the general surrounding temperature alone and the result was to create a more even general temperature. That is what Shafer sought to, and did, accomplish and it serves no distinguishing purpose to express his result in terms of the elimination of "overshooting" instead of in terms of the attainment of a desirable approach to uniformity in temperature.

Nor did such structural differences from the Daly & Dalton thermostat as are found in Shafer's amount to invention. Having one contact stationary and leaving out the additional strip responsive directly to outside temperature was but reverting to the ordinary practice in making a thermostat. The ommission of the outside strip carried with it a discard of its unneeded function and the same is true of the doing away with the lower insulated inside strip of Daly & Dalton. Whatever added sensitiveness to changes in temperature that gave to Daly & Dalton's thermostat was

not present in Shafer's. A relinquishment of some parts of a combination with the omission of their functions is not patentable invention. Richards v. Chase Elevator Co., 159 U.S. 477, 16 S.Ct. 53, 40 L.Ed. 225; Utah Radio Products Co. v. General Motors Corporation, 2 Cir., 106 F.2d 5; In re Fry, Cust. & Pat.App., 54 F.2d 433. All claims in suit are, therefore, anticipated by the Daly & Dalton patent and must be held invalid. In view of this result it is unnecessary to consider other points argued.

Decree reversed and complaint dismissed.