William S. BROWN, Trustee of the Bank-
rupt Estate of Eugene K. Barnes,
Plaintiff,

v.

Michael MYERBERG and New Trends
Associates, Inc., Defendants.

No. 62 Civ. 3653.

United States District Court,
S. D. New York.

Jan. 15, 1970.

Sparrow & Sparrow, New York City, for plaintiff; Mark H. Sparrow, New York City, of counsel.

Ellis & Ellis, New York City, for defendants; Myron A. Ellis, New York City, of counsel.

## OPINION

McLEAN, District Judge.

This action was begun on November 5, 1962 by Eugene K. Barnes, doing business as Shadows-Out Mirror Company, seeking a judgment declaring that United States Patent No. 3,059,103, issued on October 16, 1962 to defendant Myerberg on a "make-up mirror" is invalid and that it has not been infringed by a make-up mirror manufactured and sold by plaintiff. On June 2, 1964, the complaint was amended by stipulation to allege in substance that on November 20, 1962, Myerberg filed an application for reissue of the patent, that the application was granted by the Patent Office, and that on June 18, 1963, the patent was reissued to Myerberg as No. Re. 25,402 which now takes the place of the original patent No. 3,059,103.

In July 1964, plaintiff Barnes filed a petition in bankruptcy in this court. He was duly adjudicated a bankrupt. Thereafter this action was continued by his trustee in bankruptcy. In January 1967 the trustee amended his complaint to add a second count which charges in substance that Myerberg obtained his original patent and the reissue patent by fraud and that in enforcing the patent, defendants have attempted to monopolize interstate commerce in make-up mirrors in violation of the Sherman Act, all to plaintiff's damage. This count seeks recovery of treble damages in an unspecified amount.

This action is a continuation of a controversy between Barnes and Myerberg which began in 1961 and which was the subject of an action brought in August 1961 by Myerberg and New Trends Associates, Inc. (New Trends) against Barnes in the Supreme Court, New York County, which resulted in a judgment entered in that court on October 10, 1961. That litigation, which will be referred to in more detail hereinafter, did not determine the validity of the patent, which at that time had not been issued. Within a few weeks after the patent issued, Barnes continued the feud by bringing this action to attack the patent.

The controversy is not only old, but by this time it is distinctly stale. Plaintiff has been in bankruptcy and out of business since 1964. Defendant New Trends, a corporation formed by Myerberg which was the exclusive licensee under his patent, is now in Chapter XI. Neither side has manufactured a make-up mirror since late 1963 or early 1964. To cap the climax, after this action was begun, Myerberg, on October 11, 1963, assigned all his rights in the patent to Eisen Bros., Inc., a company which had manufactured the mirrors for New Trends during the comparatively brief period that New Trends was in the mirror business.

Eisen Bros., Inc., is not a party to this action. In view of the fact that it, rather than Myerberg, is now the owner of the patent, the question arises whether plaintiff may maintain this action against the original parties to test the patent's validity. At the time the action was begun in 1962, Myerberg owned the patent, as his answer admits. When it took the assignment, Eisen Bros., Inc., had notice of the pendency

of this action by virtue of the notice filed in the Patent Office by the Clerk of this court pursuant to the statute. If Eisen Bros., Inc., had any interest in defending the patent, it was incumbent upon it to intervene in this action. Eisen Bros., Inc., has not sought to do so and has manifested no interest whatever in the action. As far as appears, it is not manufacturing the mirrors either. Under the circumstances, I hold that this court still has jurisdiction to determine this controversy and to adjudicate the validity of the patent. Fed.R.Civ.P. 25 (c). *See* Etten v. Lovell Manufacturing Company, 121 F.Supp. 291 (W.D.Pa. 1954), aff'd, 225 F.2d 844 (3d Cir. 1955).

### The Validity of the Patent

The original patent No. 3,059,103 contains only one claim. It covers a make-up mirror comprising a central mirror panel, side mirror panels joined to the central panel by hinges, and a row of electric light bulbs, fourteen in all, along the top of the central panel and along the outer edge of each side panel. It states that the light bulbs shall be of comparatively large surface and low wattage, and shall be covered with a light diffusing coating. More specifically, the bulbs shall be substantially 15 watt bulbs, substantially $2\frac{1}{4}$ inches in diameter, with a ratio of surface area to wattage of about one square inch to three watts. They shall be spaced apart by a distance substantially equal to the bulb diameter.

The reissue patent No. Re. 25,402 differs from the original patent only in one respect, *i. e.*, the ratio of surface area to wattage is specified as about one square inch to one watt, instead of to three watts. It was discovered after the original patent issued that an error in mathematical computation had been made which required this correction. The change in this detail has no bearing upon the validity of the patent.

Plaintiff attacks the patent on a variety of grounds. To my mind, the critical question is whether or not Myerberg's invention was obvious to a person of ordinary skill in the art. If so, it is invalid under 35 U.S.C. § 103.

As Myerberg's patent attorney stated in one of his communications to the Patent Office, the art is "somewhat crowded." Three-panel mirrors are not new. One was revealed in patent No. 538,091 issued to Wanner as early as April 23, 1895. A string of electric light bulbs is not new. One was patented in patent No. 2,131,671 issued to Reed on September 27, 1938. A company named Lightolier, Inc., as early as 1957, manufactured a string of bulbs which were to be used as make-up lights in conjunc-designed to be used as make-up lights in conjunction with a mirror. Lightolier marketed this fixture, consisting of a metal strip containing wiring studded with bulbs encased in reflectors, under the trade name "Vanity Fair." Myerberg was aware of it. The particular bulbs used in Myerberg's invention are not new. They are standard equipment manufactured by General Electric Company.

The history of patent No. 3,059,103 in the Patent Office shows that the Examiner was troubled from the outset by the matter of obviousness. The application was filed on August 7, 1961. It contained six claims. On March 27, 1962, the Examiner rejected all of them. He pointed out that patent No. 1,014,853 issued on January 16, 1912 to Lillian Russell showed a mirror with a central panel and two side panels to each of which a single light bulb was affixed. He also referred to patent No. 1,868,104 issued on July 19, 1932 to Hoegger which described a central mirror with two side panels, to each of which three light bulbs were affixed. He further mentioned patent No. 2,556,870 issued on June 12, 1951 to Clark which showed a "source of illumination," in this case an incandescent strip, extending across the top of a mirror. He pointed out that it would be obvious in view of Clark's invention to place a row of bulbs across the top of Hoegger's mirror. As far as the bulbs themselves were concerned, he cited patent No. 1,765,242 issued to Reiter on

June 17, 1930 covering a bulb having a matte exterior which gave a diffused light. He stated that the wattage and surface area and diameter of the bulbs and their spacing were "merely matters of choice or design obvious to one having ordinary skill in the art."

On May 3, 1962, Myerberg filed a response to the Patent Office action. He deleted one claim and amended the others. On June 4, 1962, the Examiner again rejected all the claims. This time he cited patent No. 900,590 issued on October 6, 1908 to Raymond which apparently revealed a series of light bulbs mounted on the top and sides of a mirror. He also referred to patent No. 2,973,451 issued to Plishker on February 28, 1961, covering a light bulb the surface area of which was increased in order to make it cooler. The Examiner stated:

"To pluralize the illuminating means of Russell and to mount the plural illuminating means along the sides and top of the panel as shown by Raymond, and to modify the dimensions of the illuminating means of Russell so as to provide a cooler operating temperature as shown by Plishker, would all be expedients obvious to one having ordinary skill in the art. The particular wattage and the ratio of surface area to wattage are not patentably significant being merely matters of design, expedients obvious to one having ordinary skill in the art. As to claims 1 and 6, the remarks made with respect to the wattage to surface area ratio also apply to the particular bulb diameter and spacing."

Myerberg came back with a response filed on June 19, 1962 in which he eliminated all but one claim which he expressed substantially in the language which eventually appeared in the patent. He argued that his invention was novel despite all the other patents because "applicant has found a critical size and arrangement of bulbs which the prior art could not suggest, permitting intense illumination without glare and danger of burning." He pointed out that the claim "as now presented, is directed in a specific manner to the bulb wattage, diameter, surface area per watt, surface temperature and spacing." The Examiner apparently accepted this argument. Without further criticism from him, the patent was allowed on August 16, 1962 and issued on October 16, 1962.

It is apparent from this recital that the Examiner, after insisting from the outset that the invention was obvious, withdrew his objection with surprising promptness after Myerberg's response of June 19, 1962 was filed. Myerberg attributes this change of heart to a demonstration of his invention which he gave to the Examiner in June 1962. Myerberg testified that the Examiner and other Patent Office employees were impressed with the cool, shadow-free reflection which his mirror afforded. But the fact that the invention may be useful does not mean that it is not obvious.

It is particularly hard to see what difference it made that the claim was now directed "in a specific manner to the bulb wattage, diameter, surface area per watt, surface temperature and spacing." The Examiner had repeatedly said that these aspects were "merely matters of design" which were not "patentably significant."

Myerberg testified that the fact that the side panels are movable is very important because the angle of reflection varies with the angle of the side panels. But hinged movable side panels go all the way back to the Wanner, Russell and Hoegger patents. Myerberg also stressed that the bulbs on the earlier movable panels were too large and too hot, whereas his bulbs were smaller and cooler so that danger of burning the face of the user was avoided. Useful though this improvement may be, it hardly requires a flash of genius to conceive it.

As far as secondary considerations are concerned (see Graham v. John Deere Company, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)), they are almost nonexistent here. There is no evidence of a long-felt and unsolved need for such

a mirror. It has not been a commercial success.

■■ I am aware of the presumption of validity which patents enjoy in the first instance. I also appreciate the danger of viewing the matter of obviousness with the aid of hindsight. Nevertheless, after considering all the evidence, I am satisfied that the Examiner was right the first time and that he should not have allowed himself to be persuaded. I find and conclude that the invention was obvious to a person of ordinary skill in the art and that the patent is therefore invalid under Section 103.

This conclusion makes it unnecessary to consider the other grounds upon which plaintiff attacks the patent.

### Infringement and Unfair Competition

In view of the conclusion which I have reached with respect to the invalidity of the patent, it is unnecessary to determine whether or not Barnes infringed it, as far as declaratory relief is concerned. Something must be said, however, with respect to plaintiff's claim that defendants were "practicing unfair acts of competition," and that defendants conducted "a careful campaign of intimidation, harassment and annoyance against plaintiff." What this charge comes down to is this. For a time in 1961 and 1962 plaintiff manufactured and sold a mirror which from its photographs, looked remarkably like defendants' mirror. Plaintiff and defendant Myerberg were associated for a few months in the spring of 1961. They had a falling out and plaintiff went out on his own. In fact plaintiff went so far as to apply for a patent on his mirror. This triggered defendants' action against plaintiff in the Supreme Court, New York County, previously mentioned. In October 1961 that court enjoined plaintiff from proceeding with the patent application, except in conjunction with Myerberg. Plaintiff thereupon abandoned his application. The court also enjoined plaintiff from representing that he was the

sole creator or originator of his mirror. Plaintiff was subsequently held in contempt by the Supreme Court, New York County, for violation of this latter injunction.

When Myerberg's patent issued to him on October 16, 1962, defendant New Trends wrote to plaintiff and to certain of plaintiff's customers threatening suit for infringement. These letters caused certain of plaintiff's customers to decline to handle plaintiff's product any further.

There was no testimony at the trial comparing plaintiff's mirror with the claims of Myerberg's patent. Consequently, I am not in a position to decide whether or not it infringed those claims. All that I have to go on are superficial photographs of the two mirrors. I find, however, that there was sufficient likelihood of infringement to justify New Trends in claiming it. There is no reason to doubt that Myerberg and New Trends believed at the time that Myerberg's recently issued patent was valid and that plaintiff, whose conduct was suspicious, to say the least, was infringing it. Defendants acted in good faith. They were entitled to assert what they believed to be their patent rights. Kaplan v. Helenhart Novelty Corporation, 182 F.2d 311 (2d Cir. 1950); Royal Die Cutting & Heat Sealing Corp. v. Duro Pen Company, Inc., 223 F.Supp. 384 (S.D.N.Y.1963).

■ I find and conclude that defendants were not guilty of unfair competition and that they did not conduct any campaign of intimidation, harassment or annoyance against plaintiff.

### The Alleged Violation of the Antitrust Laws

Plaintiff bases this claim upon the doctrine laid down in Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). That doctrine was summarized in the concurring opinion of Mr. Justice Harlan as follows:

"We hold today that a treble-damage action for monopolization which, but

for the existence of a patent, would be violative of § 2 of the Sherman Act may be maintained under § 4 of the Clayton Act if two conditions are satisfied: (1) the relevant patent is shown to have been procured by knowing and willful fraud practiced by the defendant on the Patent Office * * * ; and (2) all the elements otherwise necessary to establish a § 2 monopolization charge are proved." 382 U.S. at 179, 86 S.Ct. at 351.

As to the first of these elements, plaintiff claims that Myerberg procured the patent by knowing and willful fraud in that he falsely represented to the Patent Office (1) that his invention had not been in public use in the United States for more than one year prior to the filing of his patent application, and (2) that he was the sole inventor of the mirror.

The first claim of fraud is based upon the fact that in May 1960, which was more than one year before Myerberg filed his patent application on August 7, 1961, Myerberg made the first of his mirrors and gave it to a friend, a Mrs. Leavitt, who used it in her apartment. This first mirror, however, was in a preliminary stage of development. It was not the same as the final product upon which Myerberg ultimately sought and obtained a patent. One notable difference between them was the fact that the mirror which Myerberg gave to Mrs. Leavitt employed 25-watt bulbs. These proved to be too hot for comfortable use of the mirror. It was because of the experience thus gained that Myerberg later, after consultation with the bulb manufacturer, General Electric Company, selected the 15-watt 2¼ inch diameter bulb as the most suitable.

I find that Myerberg's primary purpose in making this first mirror and in giving it to Mrs. Leavitt was experimental. Mrs. Leavitt tried out the mirror. As a result of this experimental use, a significant change was made before Myerberg applied for a patent on the final product. Such a prior use does not invalidate the patent. General Electric Co. v. Minneapolis-Honeywell Regulator Co., 118 F.2d 278 (2d Cir. 1941). I find and conclude that Myerberg's failure to advise the Patent Office of this prior experimental use did not constitute willful fraud on his part.

Plaintiff's second claim of fraud, i. e., Myerberg's representation in his application to the Patent Office that he was the sole inventor of the mirror, involves the story of the relationship between Myerberg and Barnes in 1961. Despite the fact that this subject was litigated in the state court action brought by Myerberg against Barnes in 1961, I permitted both Barnes and Myerberg to testify in the present case. Their testimony, in part at least, was conflicting. It was obvious that animosity persists between them, despite the years that have elapsed since these events had any practical importance.

Based upon my observations of the witnesses and their testimony before me, I accept Myerberg's version. I find that Myerberg had the original idea for this mirror, that he made the first one, which he gave to Mrs. Leavitt, without any assistance from Barnes, that Myerberg later changed and perfected his invention, and that in the spring of 1961 Myerberg organized New Trends to market the product. Barnes, an interior decorator, who was a friend or at least an acquaintance of Myerberg, saw the mirror in Mrs. Leavitt's apartment and became interested in it. He and Myerberg discussed the possibility of participation by Barnes in the marketing of the mirror. Before any definite arrangement was made, Barnes, in August 1961, decided to go into the mirror business for his own account.

Plaintiff claims that I am not at liberty to make my own findings of fact on this subject because I am bound, on the principle of res judicata or collateral estoppel, by the findings of the state court. Those findings, however, in the main, are consistent with my view of the matter. The state court found that Myerberg "first originated the idea of a

make-up mirror" and that Barnes subsequently "saw a mirror embodying plaintiff Myerberg's idea." Presumably this was the one in Mrs. Leavitt's apartment. The state court did find, however, that Barnes "collaborated and contributed in development of successive models thereof," and that Barnes "by his joint efforts with such plaintiffs, brought the commercial exploitation of the said device to fruition." The state court then went on to find that Barnes "improperly represented to the United States Patent Office that he * * * was the sole inventor of the device," and that this was "an unconscionable act on his part." The court thereupon enjoined Barnes from proceeding with the patent application "except in conjunction with Myerberg."

It is apparent from this recital that on the evidence before it the state court reached the same conclusion as I have reached as to the original conception of the invention. There is no doubt that it was Myerberg's idea. The state court, however, gave Barnes somewhat more credit than I would be willing to give him for having contributed something to the perfecting of the final product and to bringing "its commercial exploitation" to fruition. Assuming, for the sake of argument, that I am bound by this finding of the state court, the question remains whether Myerberg was guilty of knowing and willful fraud, within the meaning of *Walker*, when he stated in his oath in support of his application to the Patent Office that:

"I verily believe I am the original, first, and sole inventor of the invention or discovery in make-up mirror described and claimed therein."

█ I do not think that he was. The concurring opinion in *Walker* makes it clear that the Court was not referring to "other factors sometimes compendiously referred to as 'technical fraud.'" 382 U.S. at 179, 86 S.Ct. at 351. It seems to me that any failure on Myerberg's part to disclose to the Patent Office that Barnes had collaborated in the development of later models of the mirror and had helped to bring the commercial exploitation of the product to fruition is, at the worst, technical fraud, if it can be said to be any kind of fraud at all. In any realistic sense, Myerberg was the original, first and sole inventor of this mirror. I find that he believed his statement to be true and that he did not intentionally and willfully defraud the Patent Office. I conclude, therefore, that plaintiff has not proved the first of the two elements necessary to make out an antitrust claim under the *Walker* rule.

As to the second element, *i. e.,* "all the elements otherwise necessary to establish a § 2 monopolization charge," there has been a complete failure of proof. There has been no attempt to establish the relevant market or the exclusionary power of this particular patent in that market. Make-up mirrors of various types are sold by a number of manufacturers. The scanty evidence offered by plaintiff here could not possibly justify a finding of monopolization or attempted monopolization on the part of defendants. I conclude, therefore, that plaintiff has failed to prove the allegations of the second count.

### Relief

Plaintiff is entitled to a declaratory judgment that defendant's patent is invalid under 35 U.S.C. § 103. Since Myerberg no longer owns the patent and since New Trends has not manufactured the mirror since 1963, I see no need for an injunction restraining them from asserting the validity of the patent. Except for the declaratory judgment above mentioned, the action is in all other respects dismissed. Plaintiff's request for attorneys' fees is denied.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

Settle judgment on notice.