**BECKMAN INSTRUMENTS, INC. and Leland C. Clark, Jr., Plaintiffs,**

v.

**CHEMTRONICS, INC. and J. Ryan Neville, Defendants.**

**Civ. A. No. 3633.**

United States District Court,
W. D. Texas,
San Antonio Division.
June 7, 1971.

Frank B. Pugsley, Larry B. Feldcamp, Baker & Botts, Houston, Tex., and Bernard Ladon, Lang, Cross, Ladon, Boldrick & Green, San Antonio, Tex., for Beckman Instruments, Inc., and Leland C. Clark, Jr.; Sheldon Karon, Mario A. Martella, Chicago, Ill., of counsel.

Bill Durkee and John F. Lynch, Arnold, White & Durke, Houston, Tex., and Patrick H. Swearingen, Jr., Mathews, Nowlin, McFarlane & Barrett, San Antonio, Tex., for Chemtronics, Inc., and J. Ryan Neville.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

GUINN, District Judge.

### Statement of the Case

This case began as an action for infringement of Clark patent 2,913,386 in which defendants denied infringement, challenged the validity and title of the Clark patent, and counterclaimed for treble damages under the Sherman Act. After trial this Court filed Findings of Fact and Conclusions of Law and entered its Judgment, holding the Clark patent valid but not infringed and dismissing defendants' counterclaims.

■ The Court of Appeals for the Fifth Circuit (439 F.2d 1369) reversed the holding that the Clark patent was valid, holding it invalid on two independent grounds. The first ground is that, although Dr. Clark appeared to have made a patentable invention, some of the claims of the Clark patent were drawn too broadly and distinguished over the prior work of Dr. Richard Stow only by their limitations to "polarographic analysis". The Court of Appeals held that these were merely "new use" recitations, insufficient to distinguish and properly claim the Clark invention, and thus that the claims were invalid because of anticipation by Stow. The second ground for invalidity is that plaintiffs had failed to call the work of Dr. Stow to the attention of the Patent Examiner during the prosecution of the Clark application, which the Court of Appeals held was deliberate and constituted a failure to fulfill the "uncompromising duty" of full and good faith disclosure to the Patent Office. Accordingly the Court of Appeals held the Clark patent invalid on this independent ground.

■ Defendants' counterclaims under the Sherman Act were remanded for further consideration by this Court in light of its opinion holding the Clark patent to be invalid. These counterclaims are based on the Supreme Court's decision in Walker Process Equipment, Inc. v. Food Machinery, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965) that enforcement of a patent obtained by intentional fraud could give rise to antitrust liability.

In remanding, the Court of Appeals pointed out that the Supreme Court in *Walker Process* had emphasized that only intentional fraud consisting of knowing and willful misrepresentations of material facts was actionable, and that mere "technical fraud", or honest mistake in judgment, was not (428 F.2d 555 at p. 566). Accordingly, the following specific remand instructions were given:

"The trial court should look first to the evidence to determine whether appellants indulged in knowing, willful misrepresentation of material facts.[27] If it finds that they did, it should then look to see whether the other elements of Sherman Act violations are present—"

"[27]. Our holding above, that appellants did not fulfill an 'uncompromising duty' of frank disclosure, is all that is required for us to dispose of the issues properly before us. It does not fully answer the question whether appellants engaged in willful and knowing misrepresentations of material facts." (428 F.2d at p. 567).

### General Findings on Remand

1. At a preliminary remand hearing on January 14, 1971 this Court instructed counsel for the parties to present in writing their positions respecting additional discovery and evidence, if any, which would be needed. Plaintiffs requested the opportunity to present as witnesses on the good faith issue those persons involved in obtaining the Clark

patent, together with an expert in electrochemistry and an expert on Patent Office procedure. Defendants elected to rely on the present record, opposed plaintiffs' request to present additional evidence, and filed a motion for entry of findings on the record.

2. During a second hearing on May 4, 1971 the Court ruled that plaintiffs would not be permitted to present additional evidence, and that supplemental findings of fact and conclusions of law, directed to the question whether the Clark patent had been obtained as the result of knowing and willful misrepresentations of material facts, would be entered on the present record.

### Supplemental Findings of Fact

3. This Court's original findings of fact Nos. 1 through 11 set forth the basic facts respecting Dr. Clark's invention, the filing and issuance of the Clark patent, the exclusive license thereunder to plaintiff Beckman Instruments, Inc., and the recognition and acclaim which Dr. Clark's development has received for its solution of the oxygen measurement problem.

■ 4. As held by the Court of Appeals, some of the *claims* in the Clark patent are improperly drawn in that they cover the Stow arrangement simply put to a "different use" (428 F.2d at pp. 561, 564). This does not mean, however, that the *invention* of Dr. Clark is the same as the Stow device. That they are different was readily admitted by defendants' expert Dr. Bard (R. 579, 606),[1] and also by defendant Neville (R. 667). The basic differences in function and structure, as contrasted with the apparent similarities, were described in detail by Dr. Hume (R. 505–512). The Court of Appeals held that plaintiffs nevertheless should have called the Stow device to the attention of the patent examiner, as relevant to the broad claims of Clark. However, on the remand issue, i. e., whether plaintiffs committed an "intentional fraud", the acknowledged and significant differences between the Clark and Stow devices support plaintiffs' position that they acted in good faith and simply made an "honest mistake in judgment".

■ 5. The Court of Appeals was willing to assume (428 F.2d at p. 560) that Dr. Clark's cell was patentable, and the evidence clearly shows that he made an important and patentable invention. Some of the claims in the Clark patent recite significant structural differences between the Clark and Stow devices. In this respect, defendants' counsel admitted during the trial, when asked by the Court, that claim 8 of the Clark patent and possibly claim 1 were valid (R. 681). The Court finds that Dr. Clark was entitled to a patent for his invention, after full consideration of the prior art including Stow, with claims properly reciting the novel structural and functional features of his polarographic cell.

6. In holding the Clark patent invalid because of plaintiffs' failure to call to the attention of the Patent Examiner the prior carbon dioxide detection device of Dr. Stow, the Court of Appeals emphasized a memorandum from Beckman's patent liaison employee Strickler, dated December 6, 1956 (Defendants' Exh. N–48). In this memorandum Strickler stated that claims then pending in the Clark application read upon the Stow device, that he did not know which of the two developments was earlier, and that he was concerned over the situation. As the Court of Appeals held, the Strickler memorandum showed his knowledge of the Stow development, and his realization that there might be a problem if Dr. Clark obtained patent claims broad enough to cover Stow's glass electrode device. It was true, moreover, that not all of the claims pending in the Clark application at the time of the Strickler memorandum contained a polarographic limitation and, if read without resort to the patent specifica-

---

1. All record references are to the "Statement of Facts", the official transcript of the trial testimony.

tion, one or more of these claims covered the Stow device. With respect to the issue of plaintiffs' good faith a significant fact, however, is that all of these original claims were cancelled during the prosecution of the Clark patent application (Defendants' Exh. A) and, as held by the Court of Appeals, "under the rules of patent construction" the patent finally obtained "covers only devices for polarographic analysis" (428 F.2d at p. 562). The Strickler memorandum, particularly when considered in light of the patent prosecution as a whole (Defendants' Exh. A) and the patent ultimately issued to Dr. Clark, does not suggest any intent or plan to obtain a patent which would cover the Stow device.

7. The Strickler memorandum also states that the Stow device was a "glass electrode adaptation that he was developing for $pCO_2$ measurement" and that "The Stow invention applied to $pCO_2$ measurement may independently be of substantial interest and importance to Beckman" (Defendants' Exh. N-48, p. 1). These comments show Strickler's appreciation of the fact that the Stow and Clark developments, independently of each other, would each be of interest to an instrument manufacturer such as Beckman. They negate any inference that might otherwise be drawn from the memorandum that Strickler considered the Stow and Clark developments to be the same, or even necessarily interfering inventions.

8. There was testimony at the trial that Beckman never demanded a royalty under the Clark patent on any device for measuring carbon dioxide, and that Beckman has never paid Dr. Clark any royalty on Beckman's carbon dioxide measurement devices (R. 370, 398). This further shows that Beckman's interpretation of the scope of the Clark patent, as excluding the Stow and other carbon dioxide detection devices, was consistent with the holdings of the Court of Appeals and this Court that the Clark patent was limited to devices for polarographic analysis.

9. The evidence as a whole shows a good faith belief on the part of plaintiffs that instruments for polarographic analysis, such as the Clark oxygen cell, were basically different and patentably distinct from potentiometric carbon dioxide detection devices such as Stow's glass electrode. The testimony of Dr. Hume (R. 505–512) and the deposition testimony of Dr. Severinghaus (R. 341–344) shows that acknowledged experts in polarographic and potentiometric analysis considered the Stow potentiometric carbon dioxide device and the Clark polarographic oxygen cell to be independent and distinct developments. Dr. Severinghaus, after attending the meeting at which Stow first disclosed his membrane covered glass electrode for carbon dioxide detection, and discussing it with Dr. Stow, continued working in an effort to solve the independent problem of polarographic oxygen measurement until Dr. Clark disclosed his solution (R. 325–328). The opinions and actions of scientists directly involved in these fields corroborate plaintiffs' position that they were acting in good faith in relying upon the differences between polarographic and potentiometric analysis.

10. The Court finds that defendants have not made a prima facie showing of *Walker Process* intentional fraud because the evidence shows that plaintiffs had a good faith belief that the polarographic analysis to which the Clark patent is limited sufficiently distinguished the Stow potentiometric development and made it immaterial.

11. As certain statements made in papers filed by plaintiffs with the Patent Office during the pendency of the Clark patent application were characterized by the Court of Appeals as "misleading" (Fifth Circuit Opinion, footnote 22, p. 566), this Court has considered these statements, reproduced in Defendants' Exh. A, in the light of Stow and other prior art and the testimony of the scientific experts. In the context in which they were made, these statements as a

whole do not misrepresent the prior art or the novel features of the Clark invention.

12. The Court of Appeals opinion makes specific reference (footnote 22) to the following statement taken from Dr. Clark's letter to Beckman of April 2, 1958 (Defendants' Exh. C–61) and made to the Patent Examiner during prosecution of the Clark application:

"The Clark instrument is the only one which can measure the partial pressure of a gas in a fluid regardless of the composition of the fluid".

■ The expert witnesses for both plaintiffs and defendants testified that the Stow device and other carbon dioxide detection instruments do not and cannot directly measure the partial pressure of carbon dioxide. Plaintiffs' expert Dr. Hume testified that Stow's carbon dioxide measurement had to be made in a round-about way by measuring changes in the acidity (pH) of a liquid resulting from hydrogen ion release caused by the presence of carbon dioxide (R. 98–99), from which measurement one can calculate the carbon dioxide present (R. 103). Defendants' expert Dr. Bard agreed, stating that the Stow measurement is really a measurement of hydrogen ions as an indirect measurement of carbon dioxide (R. 527). Thus the Clark device, which detects the signal current caused by the direct reduction of oxygen at the cathode (R. 508), was the only one capable of *directly* measuring the partial pressure of a gas in a fluid regardless of the composition of the fluid. While adding the word "directly" would have made the statement more precise in its exclusion of the Stow device, it is the finding of the Court that the statement in light of the expert testimony does not demonstrate, nor does other evidence show, a deliberate intent to mislead the patent examiner.

13. Certain other statements appearing in the papers filed with the Patent Office were the subject of dispute between the scientific experts who testified at the trial. These bona fide disputes of experts militate against wilfulness in this case. Most of the accused statements, including the one quoted by the Court of Appeals in footnote 22, were directed to the applicant's analysis of the prior Brubaker et al article, and others described the disclosure and teachings of the prior patents to Darrah, Beard or Wallace, in which context their accuracy was not even challenged by defendants. While some statements were challenged by defendants' expert Bard (R. 552–555) on the ground that they implied novelty for Dr. Clark's invention in terms too general to exclude the 1953 Clark electrode and the Stow device, even this controversy is attributable in part to a continuing disagreement between the experts at the trial as to the precise meaning and applicability of certain electrochemical terms used in the statements, such as cathode, electrolyte, linear response, thin film and the like (R. 62, 67, 139–141, 343, 508, 509, 526–528, 697, 700, 701). A fair summation of the testimony is that plaintiffs' expert witnesses including Dr. Clark himself expressed their belief that the statements are accurate. In any event, this scientific, or semantic, controversy does not evidence willful and deliberate misrepresentation or give rise to any inference of an intent to deceive or mislead.

14. Many of the challenged statements made during the prosecution of Dr. Clark's application were immediately preceded or followed by specific reference to *polarographic* measurement. (See, for example, Defendants' Exh. A, pp. 7 and 8 of Paper No. 10, filed July 28, 1958). The others appear to have been made in the general context of polarographic analysis a conclusion which is supported by the statement of the Patent Examiner in his action mailed May 16, 1957, that polarographic cells have acquired a *separate status in the art.* (Defendants' Exh. A, page 1 of Paper No. 7). The Court finds that the plaintiffs relied upon this distinction in good faith.

15. The Court finds that the statements appearing in the papers filed in the Patent Office during the prosecution of the Clark application, as a whole, do not misrepresent material facts.

16. The Court finds that Dr. Clark or Beckman Instruments did not intend to mislead the Patent Examiner, or that the Examiner was in fact misled, by representations made during the prosecution of the Clark patent.

17. The Court finds that defendants have not made a prima facie showing of any knowing, willful misrepresentations of material facts.

18. The record contains no evidence that plaintiffs intended to obtain an improper patent for the Clark invention.

19. The record as a whole shows that plaintiffs acted in good faith in obtaining and seeking to enforce the Clark patent in suit.

### Conclusions of Law

20. As the Court of Appeals pointed out (428 F.2d at p. 566), the Supreme Court in *Walker Process* emphasized that only "intentional fraud" consisting of knowing and willful misrepresentations of material facts was actionable, and that mere "technical fraud" or honest mistake in judgment was not. Because the record does not show intentional fraud, or knowing and willful misrepresentations, defendants have failed to establish any basis for their counterclaims.

21. The Court of Appeals noted (428 F.2d at p. 566, footnote 24) that the Supreme Court in *Walker Process* had stated that the patentee must have *obtained* the patent through fraudulent means. As Dr. Clark was entitled to a patent for his invention, and as there is no evidence of a fraudulent intent or the use of "fraudulent means" in prosecuting the Clark application, the fact that plaintiffs may have improperly claimed the Clark invention does not under the facts of this case establish a cause of action under the *Walker Process* decision.

22. Even if a statement made in the prosecution of the Clark patent application had been shown to be false, defendants would further have had to show that the statement was "essentially material" to the issuance of the patent. *Edward Valves, Inc. v. Cameron Iron Works*, 286 F.2d 933 at p. 947 (5th Cir. 1961). *Ransburg Electro-Coating Corp. v. Nordson Corp.*, 293 F.Supp. 448 at p. 484 (N.D.Ill.1968). *Corning Glass Works v. Anchor Hocking Glass Corp.*, 253 F.Supp. 461 at pp. 469–470 (D.Del. 1966), aff'd as to dismissal of the *Walker Process* counterclaim, 374 F.2d 473 (3rd. Cir. 1967). The statements challenged by defendants as misleading were not shown to be "essentially material" to the issuance of the Clark patent, and they do not meet the materiality test required to establish *Walker Process* fraud.

23. The law is settled that proof of fraud or misrepresentation in obtaining a patent must be by clear, unequivocal and convincing evidence and that a mere preponderance of evidence which leaves the issue in doubt may not properly be a basis for such a finding. *United States v. American Bell Telephone Co.*, 167 U.S. 224, at 251, 17 S.Ct. 809, 42 L.Ed. 144 (1897). *Scott Paper Co. v. Fort Howard Paper Co.*, 432 F.2d 1198 at p. 1204 (7th Cir. 1970), cert. denied, 401 U.S. 913, 91 S.Ct. 882, 27 L.Ed. 2d 812 (1971). *Baldwin-Lima-Hamilton Corp. v. Tatnall Systems Co.*, 169 F.Supp. 1 at p. 25 (E.D.Pa.1958), aff'd per curiam 268 F.2d 395 (3rd Cir. 1959), cert. denied 361 U.S. 894, 80 S.Ct. 190, 4 L.Ed.2d 151. *Ransburg Electro-Coating Corp. v. Nordson Corp.*, 293 F.Supp. 448 at p. 483 (D.C.1968). It is equally well established that the burden of proof upon defendants in alleging fraud is a heavy one. *Edward Valves, Inc. v. Cameron Iron Works*, 286 F.2d 933, at p. 947 (5th Cir. 1961). Defendants in this case have not produced any significant evidence in support of their claim of intentional fraud.

24. The type of conduct required to establish liability under *Walker Process*

has been considered in several very recent cases. The Second Circuit considered a deliberate failure to disclose prior art which would have resulted in "final rejection of the application", coupled with "ambiguous" statements, which together showed a "lack of candor" in dealing with the Patent Office. While noting that certain challenged phrases in the Patent application "may indicate a certain furtiveness", the Court held that this "scarcely supports a charge of deliberate fraud". Indiana General Corp. v. Krystinel Corp., 421 F.2d 1023 at pp. 1028–1029 and 1033–1034 (1970), cert. den. 398 U.S. 928, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970).

The Seventh Circuit considered a patent applicant's affirmative presentation to the Patent Office of a "half-truth" to overcome a rejection, knowing that the whole truth would support the Examiner's rejection, in University of Illinois Foundation v. Blonder-Tongue Laboratories, Inc., 422 F.2d 769 at p. 777 (1970), remanded by the Supreme Court on other issues, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). While holding the resulting patent to be invalid, the Court declined to find fraud. The Seventh Circuit also considered a patentee's deliberate failure to cite prior art which was later held to invalidate the patent, in Scott Paper Co. v. Fort Howard Paper Co., 432 F.2d 1198 at pp. 1202, 1204–1205 (1970), cert. denied, 401 U.S. 913, 91 S.Ct. 882, 27 L.Ed.2d 812, 1971. It held that evidence in the record that *Scott* witnesses disagreed as to the pertinency of the prior art justified the rejection of defendant's claim of fraud and its request for attorney's fees. That Court also affirmed, 431 F.2d 261 (7 Cir. 1970), the decision of the District Court for the Northern District of Indiana in Mercantile National Bank of Chicago v. Quest, Inc., 303 F. Supp. 926 at p. 933 (1969), which had held that where the "file wrapper history as a whole" does not indicate that the Patent Examiner was deceived or misled by statements made by the patentees, their actions in prosecuting the

patented invention in the Patent Office "were not of the clear and outrageous nature as is generally found in fraud on the Patent Office cases."

The Ninth Circuit recently affirmed, 409 F.2d 1307 (1969), the decision of the District Court for the Northern District of California in Crown Machine & Tool Co. v. KVP-Sutherland Paper Co., 297 F.Supp. 542 at p. 567, which had held:

"This Court does not consider Crown's conduct in enlarging the scope of its '705 and '708 patent applications to appropriate improvements made by others as coming within the type of fraud contemplated by the *Walker* case, to wit: 'knowingly and wilfully misrepresenting facts to the Patent Office'."

In Aerodyne Machinery Corp. v. Slick Industrial Co., 169 USPQ 150 (D.Minn. 1971), not yet reported elsewhere, the Court held that the patentee's dealings with the Patent Office as an arm's length adversary, including nondisclosures which would have prevented the grant of the patent, were insufficient to demonstrate "intentional fraud in the common law sense and are not such as to enable plaintiff to establish any sort of a claim for antitrust damages".

In Brown v. Myerberg, 314 F.Supp. 939, 945 (S.D.N.Y. 1970) the Court was faced with a prior holding that the patentee "improperly represented to the United States Patent Office that he * * * was the sole inventor of the device", but held that this, at the worst, was "technical fraud" insufficient to support an antitrust claim under *Walker Process*.

Comparison of the conduct of plaintiffs Beckman and Clark with the actions described in the above cases, all of which were held to be insufficient to constitute *Walker Process* fraud, makes it apparent that defendants' counterclaims should be dismissed.

■ 25. To establish actionable fraud "scienter" or fraudulent intent also must be shown. Kolene Corp. v. Motor City Metal Treating, Inc., 440

F.2d 77 (6th Cir. 1971), not yet report-ed elsewhere. Corning Glass Works v. Anchor Hocking Glass Corp., 253 F. Supp. 461 at p. 471 (D.Del.1966), dismis-sal of the *Walker Process* counterclaim aff'd. at 374 F.2d 473 (3rd Cir., 1967). The absence in the present record of any evidence of "scienter" or fraudulent in-tent provides an additional reason why defendants have failed to establish their counterclaims.

26. This Court's finding that Plain-tiffs acted in good faith in obtaining and seeking to enforce the Clark patent com-pels the dismissal of defendants' coun-terclaims, because plaintiffs' good faith is a complete defense. Walker Process Equipment Inc. v. Food Machinery, supra.

## JUDGMENT

It is, therefore, ordered, adjudged and decreed that the Defendants and Cross-Plaintiffs Chemtronics, Inc., and J. Ryan Neville take nothing by their cross-ac-tion against the Plaintiffs and Cross-Defendants Beckman Instruments, Inc., and Leland C. Clark, Jr.